# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

TERICA IGWEDIMMA, individually, and on behalf of others similarly situated,

Plaintiffs,

v.

VEHO TECH, INC.,

Defendant.

No. 1:26-cv-00684- JLH

**DECLARATION OF AHREN EXETER**

I, Ahren Exeter, of full age, hereby declare as follows:

1. I am the Director, People Business Partner of Veho Tech, Inc.'s ("Veho" or the "Company") People Team, which provides support services including Human Resources services to the Company.

2. As part of my duties, I have knowledge of application and onboarding documents, which are created and maintained in the Company's electronic databases at or near the time of their creation in the ordinary course of business. In my role, I also have access to certain personnel records for teammates (*i.e.*, employees), which are likewise created and maintained in the ordinary course of business. Additionally, through my role and tenure with the Company, I am familiar with the business operations of Veho, including the teammate onboarding process.

3. I have personal knowledge of the facts set forth below, or knowledge based on my review of documents maintained in the regular course of business, and, if called as a witness, I could and would testify competently to the matters contained in this declaration.

**A. Candidates Provide to Veho Their Unique Email Address.**

4. When a candidate applies for employment with the Company, the candidate provides a unique email address associated with the application for tracking and correspondence purposes.

5. If Veho selects a candidate for a position, the Company emails the candidate an offer letter and other onboarding documents to their unique email address. Candidates are instructed to review the documents and to contact the Company with any questions.

6. Around the same time, through DocuSign, the Company sends the position's hiring manager an offer letter and other onboarding documents to sign on behalf of the Company.

7. Once the hiring manager electronically signs the documents, the Company, through DocuSign, automatically emails the candidate's unique email address notifying the candidate that documents are available for review and signature, along with a link to access them.

8. When the candidate clicks the DocuSign link, the candidate can review the documents and must choose a preferred method of electronic signature, either by selecting a pre-generated style or by drawing their own signature.

9. After the candidate signs all onboarding documents, the fully executed documents are automatically returned to the Company.

10. Candidates also receive email confirmation that the documents have been fully executed, and are provided with copies either by way of PDF attachment or a link to DocuSign to access the executed documents.

11. The Company maintains executed copies of onboarding documents in the ordinary course of business through its electronic database and Human Resources Information System (HRIS).

**B. Ms. Igwedimma Agreed to the Arbitration Clause in Her Offer Letter.**

12. When Ms. Igwedimma applied for employment with Veho, she provided the unique email address of terica334@gmail.com.

13. On May 4, 2022, Veho offered Terica Igwedimma employment as a Remote Coordinator, Live Client Operations.

14. That same day, through DocuSign, the Company sent Ms. Igwedimma's Offer Letter and Employee Confidential Information and Invention Assignment Agreement to Katie Miller (the position's hiring manager) to execute on behalf of the Company.

15. Ms. Miller electronically signed these documents on May 5, 2022, causing DocuSign to send a link to Ms. Igwedimma's unique email address notifying her that documents were available for review and signature.

16. Ms. Igwedimma clicked on the Docusign link emailed to her unique email address, accessed her Offer Letter, Employee Confidential Information and Invention Assignment Agreement, and Acknowledgment and Receipt of Veho's Teammate Handbook, reviewed the documents, selected a pre-selected electronic signature style, and signed the documents on May 5, 2022.

17. A true and correct copy of Ms. Igwedimma's Offer Letter, Confidential Information and Invention Assignment Agreement, and Acknowledgment and Receipt of Veho's Teammate Handbook is attached hereto as Ex. 1.

18. In 2024, Ms. Igwedimma electronically signed a position transfer document sent to her unique email address, terica334@gmail.com.

19. On January 8, 2026, Ms. Igwedimma requested that the Company change her name from "Terica Jerome" to "Terica Igwedimma." Her emergency contact information in the Company's HRIS lists a spouse with the same last name.

20. Ms. Igwedimma's employment with Veho ended on May 15, 2026.

I declare, pursuant to 28 U.S.C. § 1746 and under the penalty of perjury that these statements made by me are true and correct.

Ahren Exeter

Dated:

______________________________

Ahren Exeter

2026-06-30

Director,

People Business Partner

# EXHIBIT 1

veho

May 4, 2022
Re: Offer Letter

Dear Terica Jerome,

Congratulations! On behalf of Veho Tech, Inc. (the "Company"), I am pleased to extend you an offer to join our team. The details of our offer are as follows:

You will be responsible for all duties as a Coordinator, Live Client Operations, Remote, and will report to Katie Miller. Your primary work location will be Remote. This is a Full-time position. The Company may change your position, duties, and work location from time to time in its discretion.

Your base wage will be $15 per hour, less payroll deductions and withholdings, paid on the Company's normal payroll schedule.

During your employment, you may be eligible to participate in the standard benefits plans offered to similarly situated employees by the Company from time to time, subject to plan terms and generally applicable Company policies. Attached to this offer letter you will find the Veho National Teammate Handbook and applicable State Supplement, including the receipt acknowledgement(s) for your signature. Details around important Veho policies including sick time, vacation, and more can be found here.

Subject to approval by the Company's Board of Directors (the "***Board***"), the Company anticipates granting you an option to purchase 62 shares of the Company's common stock at the fair market value as determined by the Board as of the date of grant (the "***Option***"). The anticipated Option will be governed by the terms and conditions of the Company's 2019 Equity Incentive Plan (the "***Plan***") and your grant agreement, and will include the following vesting schedule: 12/48ths of the total shares will vest on the one year anniversary of the vesting commencement date, and 1/48th of the total shares will vest each month thereafter on the same day of the month as the vesting commencement date (or if there is no corresponding day, on the last day of the month), subject to your Continuous Service (as defined in the Plan) as of each such date.

As a Company employee, you will be expected to abide by Company rules and policies. As a condition of employment, you must sign and comply with the attached Employee Confidential Information and Inventions Assignment Agreement which prohibits unauthorized use or disclosure of the Company's proprietary information, among other obligations.

In your work for the Company, you will be expected not to use or disclose any confidential information, including trade secrets, of any former employer or other person to whom you have an obligation of confidentiality. Rather, you will be expected to use only that information which is generally known and used by persons with training and experience comparable to your own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company. You agree that you will not bring onto Company premises any unpublished documents or property belonging to any former employer or other person to whom you have an obligation of confidentiality. You hereby represent that you have disclosed to the Company any contract you have signed that may restrict your activities on behalf of the Company.

Normal business hours vary as required by the Company's needs, and you will sign up for designated shifts prior to work. You are responsible to notify the Company for any hours you are unable to work.

Your employment with the Company will be "at-will." You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the Company. Likewise, the Company may terminate your

employment at any time, with or without cause or advance notice. Your employment at-will status can only be modified in a written agreement signed by you and by an officer of the Company.

This offer is contingent upon the successful completion of a background check and satisfactory proof of your identity and legal authority to work in the United States for I-9 Form purposes, in accordance with the legally prescribed timeframes as required by law. Please be prepared to provide acceptable document(s) to complete the I-9 Form (see Form I-9 Acceptable Documents).

To ensure the rapid and economical resolution of disputes that may arise in connection with your employment with the Company, you and the Company agree that any and all disputes, claims, or causes of action, in law or equity, including but not limited to statutory claims, arising from or relating to the enforcement, breach, performance, or interpretation of this Agreement, your employment with the Company, or the termination of your employment, shall be resolved, to the fullest extent permitted by law, by final, binding and confidential arbitration conducted by JAMS or its successor, under JAMS' then applicable rules and procedures for employment disputes (available upon request and also currently available at http://www.jamsadr.com/rules-employment-arbitration/). You acknowledge that by agreeing to this arbitration procedure, both you and the Company waive the right to resolve any such dispute through a trial by jury or judge or administrative proceeding. You will have the right to be represented by legal counsel at any arbitration proceeding. The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written statement signed by the arbitrator regarding the disposition of each claim and the relief, if any, awarded as to each claim, the reasons for the award, and the arbitrator's essential findings and conclusions on which the award is based. The arbitrator shall be authorized to award all relief that you or the Company would be entitled to seek in a court of law. The Company shall pay all JAMS arbitration fees in excess of the administrative fees that you would be required to pay if the dispute were decided in a court of law. Nothing in this letter agreement is intended to prevent either you or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration.

This letter, together with your Employee Confidential Information and Inventions Assignment Agreement, forms the complete and exclusive statement of your employment agreement with the Company. It supersedes any other agreements or promises made to you by anyone, whether oral or written. Changes in your employment terms, other than those changes expressly reserved to the Company's discretion in this letter, require a written modification signed by an officer of the Company. If any provision of this offer letter agreement is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of this offer letter agreement and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible under applicable law. This letter may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*****

*[signatures to follow on next page]*

veho

Please sign and date this letter, and the enclosed Employee Confidential Information and Inventions Assignment Agreement and return them to me by May 9, 2022, if you wish to accept employment at the Company under the terms described above. If you accept our offer, we would like you to start on May 18, 2022.

We look forward to your favorable reply and to a productive and enjoyable work relationship.

Sincerely,

DocuSigned by:
Katie Miller
641971619450488...

Understood and Accepted:

DocuSigned by:
Terica Jerome
ED12C98EEB30427...

Employee Signature

May 4, 2022

Date

Terica Jerome

Employee Name

# VEHO TECH, INC.

## EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

In consideration of my employment or continued employment by **Veho Tech, Inc.**, its subsidiaries, parents, affiliates, successors and assigns (together "***Company***"), and the compensation paid to me now and during my employment with Company, I hereby enter into this Employee Confidential Information and Invention Assignment Agreement (the "***Agreement***") and agree as follows:

1. **Confidential Information Protections**.

**1.1 Recognition of Company's Rights; Nondisclosure**. I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any of Company's Confidential Information, except as such disclosure, use or publication may be required in connection with my work for Company, or unless an officer of Company expressly authorizes such disclosure. I will obtain Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information will be the sole and exclusive property of Company and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

1.2 **Confidential Information**. The term "***Confidential Information***" means any and all confidential knowledge, data or information of Company. By way of illustration but not limitation, "***Confidential Information***" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and all Intellectual Property Rights (as defined below) therein (collectively, "***Inventions***"); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of Company could use to the competitive disadvantage of Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which was known to me prior to my employment with Company or which is generally known in the trade or industry through no breach of this Agreement or other act or omission by me. Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement

Case 1:26-cv-00084-JLH Document 6-3 Filed 07/02/26 Page 11 of 22 PageID #: 175

veho

between the Company and me, nothing in this Agreement will limit my right to discuss my employment or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or other federal government agency or similar state or local agency or to discuss the terms and conditions of my employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure.

1.3 **Third Party Information**. I understand, in addition, that Company has received and in the future will receive from third parties their confidential and/or proprietary knowledge, data or information (***"Third Party Information"***) subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use, except in connection with my work for Company, Third Party Information or unless expressly authorized by an officer of Company in writing.

1.4 **Term of Nondisclosure Restrictions**. I understand that Confidential Information and Third Party Information is never to be used or disclosed by me, as provided in this Section 1. If a temporal limitation on my obligation not to use or disclose such information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and Company agrees that the two year period after the date my employment ends will be the temporal limitation relevant to the contested restriction; ***provided, however***, that this sentence will not apply to trade secrets protected without temporal limitation under applicable law.

1.5 **No Improper Use of Information of Prior Employers and Others**. During my employment by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

2. **Assignments of Inventions**.

2.1 **Definitions**. As used in this Agreement, the term ***"Intellectual Property Rights"*** means all trade secrets, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "***Copyright***" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "***Moral Rights***" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

2.2 **Excluded Inventions and Other Inventions**. Attached hereto as **Exhibit A** is a list describing all existing Inventions, if any, (a) that are owned by me or in which I have an interest and were made or acquired by me prior to my date of first employment by Company, (b) that may relate to Company's business or actual or demonstrably anticipated research or development, and

(c) that are not to be assigned to Company ("***Excluded Inventions***"). If no such list is attached, I represent and agree that it is because I have no Excluded Inventions. For purposes of this Agreement, "***Other Inventions***" means Inventions in which I have or may have an interest, as of the commencement of my employment or thereafter, other than Company Inventions (as defined below) and Excluded Inventions. I acknowledge and agree that if I use any Excluded Inventions or any Other Inventions in the scope of my employment, or if I include any Excluded Inventions or Other Inventions in any product or service of Company, or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, I will immediately so notify Company in writing. Unless Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to Company, in such circumstances (whether or not I give Company notice as required above), a non-exclusive, perpetual, transferable, fully-paid and royalty-free, irrevocable and worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Excluded Inventions and Other Inventions. To the extent that any third parties have rights in any such Other Inventions, I hereby represent and

warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.

**2.3 Assignment of Company Inventions**. Inventions assigned to Company or to a third party as directed by Company pursuant to Section 2.6 are referred to in this Agreement as "***Company Inventions***." Subject to Section 2.4 and except for Excluded Inventions set forth in **Exhibit A** and Other Inventions, I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company. To the extent required by applicable Copyright laws, I agree to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) my Copyright rights in and to such Inventions. Any assignment of Company Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions (and any Intellectual Property Rights with respect thereto).

**2.4 Unassigned or Nonassignable Inventions**. I recognize that this Agreement will not be deemed to require assignment of any Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, trade secrets, or Confidential Information, except for those Inventions that either (i) relate to the Company's actual or anticipated business, research or development, or (ii) result from or are connected with work performed by me for the Company. In addition, this Agreement does not apply to any Invention which qualifies fully for protection from assignment to the Company under any specifically applicable state law, regulation, rule or public policy ("***Specific Inventions Law***").

2.5 **Obligation to Keep Company Informed**. During the period of my employment, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others. At the time of each such disclosure, I will advise Company in writing of any Inventions that I believe fully qualify for protection under the provisions of the Specific Inventions Law; and I will at that time provide to Company in writing all evidence necessary to substantiate that belief. Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to Company pursuant to this Agreement relating to Inventions that qualify fully for protection under the Specific Inventions Law. I will preserve the confidentiality of any Invention that does not fully qualify for protection under the Specific Inventions Law.

2.6 **Government or Third Party**. I agree that, as directed by Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

2.7 **Ownership of Work Product**.

**(a)** I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

**(b)** I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my employment, and I hereby irrevocably and unconditionally assign to Company all right, title, and interest worldwide in and to such work product. I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company.

2.8 **Enforcement of Intellectual Property Rights and Assistance**. I will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. My obligation

to assist Company with respect to Intellectual Property Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my employment, but Company will compensate me at a reasonable rate after my termination for the time actually spent by me at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

2.9 **Incorporation of Software Code**. I agree that I will not incorporate into any Company software or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company **except** in strict compliance with Company's policies regarding the use of such software.

3. **Records**. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, which records will be available to and remain the sole property of Company at all times.

4. **Duty of Loyalty During Employment**. I agree that during the period of my employment by Company, I will not, without Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company.

5. **No Solicitation of Employees, Consultants, Contractors, or Customers or Potential Customers**. I agree that during the period of my employment and for the one year period after the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company:

5.1 solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact;

5.2 solicit, induce, encourage, or participate in soliciting, inducing, or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company to render services to me or any other person or entity that researches, develops, markets, sells, performs or provides or is preparing to develop, market, sell, perform or provide Conflicting Services (as defined below);

5.3 hire, employ, or engage in a business venture with as partners or owners or other joint capacity, or attempt to hire, employ, or engage in a business venture as partners or owners or other joint capacity, with any person then employed by Company or who has left the employment of Company within the preceding three months to research, develop, market, sell, perform or provide Conflicting Services;

5.4 solicit, induce or attempt to induce any Customer or Potential Customer (as defined below), to terminate, diminish, or materially alter in a manner harmful to Company its relationship with Company;

5.5 solicit or assist in the solicitation of any Customer or Potential Customer to induce or attempt to induce such Customer or Potential Customer to purchase or contract for any Conflicting Services; or

5.6 perform, provide or attempt to perform or provide any Conflicting Services for a Customer or Potential Customer.

The parties agree that for purposes of this Agreement, a "***Customer or Potential Customer***" is any person or entity who or which, at any time during the one year period prior to my contact with such person or entity as described in Sections 5.4, 5.5 or 5.6 above if such contact occurs during my employment or, if such contact occurs following the termination of my employment, during the one year period prior to the date my employment with Company ends: (i) contracted for, was billed for, or received from Company any product, service or process with which I worked

directly or indirectly during my employment by Company or about which I acquired Confidential Information; or (ii) was in contact with me or in contact with any other employee, owner, or agent of Company, of which contact I was or should have been aware, concerning the sale or purchase of, or contract for, any product, service or process with which I worked directly or indirectly during my employment with Company or about which I acquired Confidential Information; or (iii) was solicited by Company in an effort in which I was involved or of which I was aware.

6. **Non-Compete Provision**.

**6.1** I acknowledge and agree that in the course of my employment, I will (i) have access to and knowledge of the Company's trade secrets, (ii) serve in an executive or management position, and/or (iii) serve as professional staff to someone who serves in an executive or management position, as applicable. To protect the Company's legitimate business interests arising from my access to and knowledge of the Company's trade secrets and/or the nature of my employment, as applicable, I agree that during my employment with the Company and for the one year period after the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, directly or indirectly, as an officer, director, employee, consultant, owner, partner, or in any other capacity solicit, perform, or provide, or attempt to perform or provide Conflicting Services (defined below) anywhere in the Restricted Territory (defined below), nor will I assist another person to solicit, perform or provide or attempt to perform or provide Conflicting Services anywhere in the Restricted Territory. Notwithstanding the foregoing, this restriction under Section 6.1 will not apply if my duties at such do not relate to the development, marketing or sale (or related strategies) of any product or service offered or provided by the Company or being actively developed by the Company; provided that I have delivered to the Company a written statement, confirmed by my prospective employer or consulting client, as the case may be, describing my duties and stating that such duties are consistent with my obligations under this Agreement.

6.2 The parties agree that for purposes of this Agreement, "***Conflicting Services***" means any product, service, or process or the research and development thereof, of any person or organization that competes with a product, service, or process, including the research and development thereof, of Company with which I worked directly or indirectly during my employment by Company or about which I acquired Confidential Information during my employment by Company.

6.3 The parties agree that for purposes of this Agreement, "***Restricted Territory***" means anywhere in the United States.

7. **Reasonableness of Restrictions**.

7.1 I agree that I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by the Agreement and the restrictions contained in it.

7.2 In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and Company agree that the court will read the Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

7.3 If the court declines to enforce this Agreement in the manner provided in subsection 7.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

7.4 Furthermore, the parties agree that the market for Company's products is at least the entire United States. If, however, after applying the provisions of subsections 7.2 and 7.3, a court still decides that this Agreement or any of its restrictions is unenforceable for lack of reasonable geographic limitation and the Agreement or restriction(s) cannot otherwise be enforced, the parties hereby agree that the 100 mile radius from any location at which I worked for Company on either a regular or occasional basis during the one year immediately preceding termination of my employment with Company will be the geographic limitation relevant to the contested restriction.

8. **No Conflicting Agreement or Obligation**. I represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my

employment by Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

9. **Return of Company Property**. When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time with or without notice. Prior to leaving, I will cooperate with Company in attending an exit interview and completing and signing Company's termination statement if required to do so by Company.

10. **Legal and Equitable Remedies**.

10.1 I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

**10.2** I agree that if Company is successful in whole or in part in any legal or equitable action against me under this Agreement, Company will be entitled to payment of all costs, including reasonable attorney's fees, from me.

**10.3** In the event Company enforces this Agreement through a court order, I agree that the restrictions of Sections 5 and 6 will remain in effect for a period of 12 months from the effective date of the Order enforcing the Agreement.

11. **Notices**. Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

12. **Publication of This Agreement to Subsequent Employer or Business Associates of Employee**.

**12.1** If I am offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity while the restrictions described in Sections 5 and 6 of this Agreement are in effect I agree to inform my potential employer, partner, co-owner and/or others involved in managing the business with which I have an opportunity to be associated of my obligations under this Agreement and also agree to provide such person or persons with a copy of this Agreement.

**12.2** I agree to inform Company of all employment and business ventures which I enter into while the restrictions described in Sections 5 and 6 of this Agreement are in effect and I also authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business with which I am employed or associated and to make such persons aware of my obligations under this Agreement.

13. **General Provisions**.

13.1 **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by and construed according to the laws of the State of Colorado as such laws are applied to agreements entered into and to be performed entirely within Colorado between residents of Colorado. I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in Colorado for any lawsuit filed there against me by Company arising from or related to this Agreement.

13.2 **Severability**. In case any one or more of the provisions, subsections, or sentences contained in

this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

13.3 **Successors and Assigns**. This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

13.4 **Survival**. This Agreement will survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

13.5 **Employment At-Will**. I agree and understand that nothing in this Agreement will change my at-will employment status or confer any right with respect to continuation of employment by Company, nor will it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause or advance notice.

13.6 **Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

13.7 **Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

13.8 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

13.9 **Advice of Counsel**. **I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.**

13.10 **Entire Agreement**. The obligations pursuant to Sections 1 and 2 (except Subsection 2.4) of this Agreement will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

*[signatures to follow on next page]*

This Agreement will be effective as of May 18, 2022.

**EMPLOYEE:**

**I have read this agreement carefully and understand its terms. I have completely filled out Exhibit A to this Agreement.**

DocuSigned by:
Terica Jerome
ED12C98EEB30427...

(Signature)

Terica Jerome
Name

May 4, 2022
Date

**COMPANY:**

**Accepted and agreed**

**Veho Tech, Inc.**

By: DocuSigned by:
Katie Miller
641971619450488...

Name: Katie Miller
Title: Regional Manager, Live Client Operations

veho

**EXHIBIT A**

**EXCLUDED INVENTIONS**

**TO:** **Veho Tech, Inc.** **FROM:**

**DATE:** May 4, 2022

**1.** **Excluded Inventions Disclosure**. Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

No Excluded Inventions.

See below:

Additional sheets attached.

**2.** Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

| | Excluded Invention | Party(ies) | Relationship |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

Additional sheets attached.

# VEHO NATIONAL TEAMMATE HANDBOOK

## For U.S. TEAMMATES

## Last Updated: November 8, 2021

## ACKNOWLEDGEMENT AND RECEIPT

I acknowledge that I have received and read a copy of the Veho Handbook and the applicable State Supplement for the state in which I work. I understand that the Handbook and Supplement set forth the terms and conditions of my employment with the Company as well as the duties, responsibilities and obligations of employment with the Company. I understand that Veho has provided me various alternative channels, including confidential channels, to raise concerns of violations of this handbook and company policies and encourages me to do so promptly so that Veho may effectively address such situations, and I understand that nothing herein interferes with any right to report concerns, make lawful disclosures, or communicate with any governmental authority regarding potential violations of laws or regulations. I agree to abide by and be bound by the rules, policies, and standards set forth in the Handbook and applicable State Supplement.

I acknowledge that, except where required otherwise by applicable state law, my employment with Veho is at-will, meaning that it is not for a specified period of time and that the employment relationship may be terminated at any time for any reason, with or without cause or notice, by me or the Company. I further acknowledge that only the President/Owner or that person’s authorized representative has the authority to enter into an agreement that alters the fact that my employment with Veho is at-will. Any such agreement must be in writing and signed by the President/Owner or an authorized representative.

I further acknowledge that the Company reserves the right to revise, delete and add to the provisions of the Handbook and state supplement, but that all such revisions, deletions, or additions must be in writing. No oral statements or representations can change the provisions of the handbook or supplement. Furthermore, the Company’s policy of at-will employment can only be changed as stated in the prior paragraph.

I understand and acknowledge that nothing in this Handbook or in any other document or policy is intended to prohibit me from reporting concerns to, filing a charge or complaint with, making lawful disclosures to, providing documents or other information to or participating in an investigation or hearing conducted by the Equal Employment Opportunity Commission (“EEOC”), National Labor Relations Board (“NLRB”), Securities and Exchange Commission (“SEC”) or any other federal, state or local agency charged with the enforcement of any laws.

I also understand and acknowledge that nothing about the policies and procedures set forth in this Handbook should be construed to interfere with any employee rights provided under state or federal law, including Section 7 of the National Labor Relations Act.

I have read and understand the above statements.

DocuSigned by:
Terica Jerome
ED12C98EEB30427...

(Signature)

Name

May 4, 2022

Date

**[TO BE PLACED IN EMPLOYEE'S EMPLOYMENT FILE]**

DocuSign

## Certificate Of Completion

Envelope Id: 5B1818772B19434EA6E8FFDD33040280 — Status: Completed

Subject: Veho | Offer Letter

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 14 | Signatures: 5 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Veho HR |
| AutoNav: Enabled | | 1002 Walnut Street |
| EnvelopeId Stamping: Enabled | | Suite 200 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Boulder, CO 80302 |
| | | hr@shipveho.com |
| | | IP Address: 34.223.170.64 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>5/4/2022 9:00:33 AM | Holder: Veho HR<br>hr@shipveho.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Katie Miller<br>katie.miller@shipveho.com<br>Security Level:<br>.Email<br>ID: 49953d5a-706f-457d-b297-912f1c488eb7<br>5/5/2022 5:56:36 AM | DocuSigned by:<br>katie Miller<br>641971619450488...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to katie.miller@shipveho.com<br>Using IP Address: 74.65.200.127 | Sent: 5/4/2022 9:00:34 AM<br>Viewed: 5/5/2022 5:56:50 AM<br>Signed: 5/5/2022 5:57:22 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 5/5/2022 5:56:50 AM
ID: 6978017b-033e-4e58-aabb-026947206451

| | | |
|---|---|---|
| Terica Jerome<br>terica334@gmail.com<br>Security Level:<br>.Email<br>ID: 16447afb-7e66-49b5-8f7a-7ef6a0af72f6<br>5/5/2022 6:19:23 AM | DocuSigned by:<br>Terica Jerome<br>ED12C98EEB30427...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to terica334@gmail.com<br>Using IP Address: 76.73.142.141 | Sent: 5/5/2022 5:57:23 AM<br>Viewed: 5/5/2022 6:19:55 AM<br>Signed: 5/5/2022 6:22:48 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 5/5/2022 6:19:55 AM
ID: 192aae81-45c8-4d58-80b1-2a43c03b97f0

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/4/2022 9:00:34 AM |
| Certified Delivered | Security Checked | 5/5/2022 6:19:55 AM |
| Signing Complete | Security Checked | 5/5/2022 6:22:48 AM |
| Completed | Security Checked | 5/5/2022 6:22:48 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**